**Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000933
07-JUN-2019
01:49 PM**

NO. CAAP-15-0000933

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


KATHLEEN BROOKE ROBERTS, Plaintiff-Appellant,
v.
ANTHONY JAYSWAL, D.C., dba HEALING HANDS
CHIROPRACTIC OF MAUI, Defendant-Appellee,
and
JOHN DOES 1-5, JOHN DOE CORPORATIONS 1-5,
JOHN DOE PARTNERSHIPS 1-5, ROE NON-PROFIT
CORPORATIONS 1-5, and ROE GOVERNMENTAL
AGENCIES 1-5, Defendants

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CIVIL NO. 12-1-0741(1))


SUMMARY DISPOSITION ORDER
(By: Ginoza, C.J., and Fujise and Reifurth, JJ.)

This appeal arises out of an action for medical negligence and negligent failure to obtain informed consent for chiropractic care, in which the requirement of expert testimony/opinion is disputed. Plaintiff-Appellant Kathleen Brooke Roberts appeals from the October 19, 2015 Order Granting Defendant Anthony Jayswal, D.C. dba Healing Hands Chiropractic of Maui's Motion for Summary Judgment Filed on August 4, 2015 ("MSJ Order") and the November 18, 2015 Final Judgment in favor of Jayswal, both entered by the Circuit Court of the Second Circuit ("Circuit Court").[1]

In the summer of 2008, Roberts sustained an injury to her right elbow while surfing. Due to recurring pain, Roberts presented to Jayswal for a consultation on June 28, 2010. That

---

[1] The Honorable Rhonda I.L. Loo presided.

same day, Roberts signed a "Terms of Acceptance" form. Roberts' first treatment occurred on July 28, 2010, and on August 19, 2010, during her tenth appointment with Jayswal, Roberts claims that Jayswal, without obtaining informed consent, manipulated her right shoulder, alleged to be asymptomatic at the time, and injured her ("August 19, 2010 Injury").

On August 16, 2012, Roberts filed a Complaint against Jayswal, claiming medical negligence due to injuries sustained as a result of negligent chiropractic care, treatment, and services rendered by Jayswal, and failure to obtain informed consent for the alleged unauthorized procedure that caused damage to her right shoulder.

On March 10, 2014 Jayswal responded to Roberts' first request for answers to interrogatories dated January 6, 2014 ("Jayswal's Answers to Interrogatories"). Roberts would later rely on Jayswal's answer to interrogatory no. 3[2] ("Answer to Interrogatory No. 3") in her opposition to Jayswal's motion for summary judgment.

On July 22, 2014, the Circuit Court entered a Notice of Trial Date setting trial for April 20, 2015. On May 5, 2015, the

---

[2]    Jayswal's Answers to Interrogatories provide, in relevant part:

**INTERROGATORY 3:**

If you contend that KATHLEEN B. ROBERTS gave you an informed consent for the risk of injury to her right shoulder that is the subject of this action, state with particularity the content of such consent, the date, time and place such consent was granted, the names and addresses of any other persons present when such consent was granted, and the dates and titles of any documents which support such contentions.

**ANSWER TO INTERROGATORY 3:**
Ms. Roberts signed a Terms of Acceptance form that serves as an informed consent for chiropractic services the first day she became a patient in my office, June 28, 2010. My wife (at the time) and Receptionist Jenna Keck was a witness, and the patient Ms. Roberts did sign the informed consent form, titled Terms of Acceptance, with careful time and review, with her full faculties, and under no visible duress. My office uses a standard consent form used by many Chiropractors who similarly focus on sublaxtion. Such forms are common practice in the chiropractic profession. A copy of the Terms of Acceptance signed by Ms. Roberts will be provided along with these responses.

Circuit Court entered a second Notice of Trial Date setting trial for November 16, 2015. Each Notice of Trial Date included pretrial orders requiring that parties intending to call an expert witness "exchange with opposing counsel a detailed report from each expert witness" and specifying that "[n]o expert opinion other than those disclosed in the written report of that expert shall be permitted at trial." On June 29, 2015, the Circuit Court filed a Pretrial Order Re: Expert Witnesses and Reports, noting the new trial date of November 16, 2015, and ordering that the disclosure of expert witnesses and reports was closed as of May 1, 2015.

Jayswal filed a motion for summary Judgment ("MSJ") on the basis that Roberts had failed to provide any expert opinion establishing breach of the standard of care, the materiality element of informed consent, and causation. Jayswal attached, as exhibits to his MSJ, reports by David N. Young, D.C. and Kent Davenport, M.D., and depositions of Roberts and Jay Marumoto, M.D.

Roberts filed a Notice of Opposition and Opposition to Defendant['] s Motion for Summary Judgment ("Opposition to MSJ"). In her Opposition to MSJ, Roberts took no issue with the disclosure of expert witnesses deadline but argued, in pertinent part, that she could rely on the doctrine of res ipsa loquitur to negate the need for expert testimony on the issue of liability and that she could show a lack of informed consent by Jayswal's Answer to Interrogatory No. 3 and by Jayswal's medical records, including the "Terms of Acceptance" form. Roberts attached, as exhibits to her Opposition to MSJ, Jayswal's Answers to Interrogatories and the Terms of Acceptance.

The Circuit Court entered the MSJ Order and subsequently entered a Final Judgment in favor of Jayswal and against Roberts as to all claims in Roberts' Complaint.

On appeal, Roberts contends that the Circuit Court erred in granting Jayswal's MSJ because: (1) as to the medical negligence claim, the doctrine of res ipsa loquitur applies to chiropractic care cases, thereby obviating the need for medical expert testimony; and (2) as to the informed consent claim,

Jayswal's own medical records established his failure to obtain informed consent from Roberts for the chiropractic treatment to her right shoulder.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, as well as the relevant statutory and case law, we affirm.

(1) "It is well settled that in medical malpractice actions, the question of negligence must be decided by reference to relevant medical standards of care for which the plaintiff carries the burden of proving through expert medical testimony." *Craft v. Peebles*, 78 Hawai'i 287, 298, 893 P.2d 138, 149 (1995) (citing *Nishi v. Hartwell*, 52 Haw. 188, 195, 473 P.2d 116, 121 (1970)). Roberts, here, invokes the doctrine of res ipsa loquitur as satisfaction of her obligation, otherwise, to present medical testimony.

"*Res ipsa loquitur* permits an inference of negligence when the thing that produced a person's injury is under the control and management of the defendant, and the injury could not have occurred in the ordinary course of events but for the defendant's failure to exercise due care." *Winfrey v. GGP Ala Moana LLC*, 130 Hawai'i 262, 272, 308 P.3d 891, 901 (2013) (citing *Carlos v. MTL*, 77 Hawai'i 269, 277, 883 P.2d 691, 699 (App. 1994)). The doctrine, however, is not applicable "[w]here an accident could have occurred in the normal course without negligence, or where two equally plausible inferences can be drawn as to whether the accident was caused by negligence[.]" *Id.* at 272-73, 308 P.3d at 901-02 (citing *Carlos*, 77 Hawai'i at 278, 883 P.2d at 700).

Roberts argues that because the doctrine of res ipsa loquitur applies to chiropractic care cases, the Circuit Court erred in granting summary judgment. Roberts maintains that the Circuit Court's determination that res ipsa loquitur did not apply to this case was "apparently" because Roberts had relied on out-of-state cases to support her position. This argument, however, misconstrues the Circuit Court's ruling.

The Circuit Court never indicated in its MSJ Order or Final Judgment that its ruling turned on whether res ipsa loquitur applies to chiropractic care cases. Moreover, at the hearing on Jayswal's MSJ, while the Circuit Court rejected Roberts' reliance on out-of-state cases that were not binding on this jurisdiction, the Circuit Court determined that Roberts' claimed injuries "are not so clear as to automatically establish liability and to remove any need for medical expert testimony."

Indeed, D.C. Young's January 5, 2015 report reflected that "[t]o a reasonable degree of chiropractic/medical probability it is my opinion that the forces and circumstances of Dr. Jayswal's 8-19-2010 mobilization are less likely to have caused labral injury than the repeated forces associated with Ms. Roberts' recreational activities. . . ."[3] Dr. Davenport corroborated D.C. Young's conclusions, stating in his

---

[3]    The report provides, in relevant part:

> 11.    To a reasonable degree of chiropractic/medical probability it is my opinion that Dr. Jayswal's shoulder manipulation of 8-19-2010 did not cause instability of Ms. Roberts' right shoulder. The physical exams at Lahaina PT [9-28-2010] and Dr. Egami [9-23-2010, 10-28-2010, 9-26-2012] are negative for anterior or posterior instability of the glenohumeral joint. It's anatomically/physiologically inconsistent that clinical instability was caused by Dr. Jayswal and present in August 2010 but absent in October 2010 and latter 2012 but then present again in 2013. Dr. M[a]r[u]moto's impression that chronic instability was present prior to his exam appears to be based on the history given by Ms. Roberts at that time; her history is not consistent with the clinical findings from that earlier time period.
>
> 12.    To a reasonable degree of chiropractic/medical probability it is my opinion that the forces and circumstances of Dr. Jayswal's 8-19-2010 mobilization are less likely to have caused labral injury than the repeated forces associated with Ms. Roberts' recreational activities of surfing, mountain biking and perhaps sailboarding. First, the anatomy is consistent with long term "wear and tear." Dr. Egami read the October 2010 MRI as showing "mild degenerative changes in the labrum" and Dr. M[a]r[u]moto also read the 2012 MRI as showing "mild degenerative changes in the labrum." The 2013 MRI with contrast similarly found "subtle posterosuperior and posteroinferior labral free edge fraying." Second, from my personal experience as a recreational surfer for decades in all sizes of waves, in "wipe out" situations the surfer's arms/shoulders are exposed to tremendous forces and flail arm-like positions that are more likely to stress/subluxate the shoulder and wear the labral edges than a single isometric muscle contraction.

5

February 17, 2015 report that "[i]t is highly unlikely" that the shoulder manipulation performed on August 19, 2010 "resulted in both anterior and posterior labral tears" and that "[i]t is medically probable that the manipulation as demonstrated which occurred on 08/19/10 did not cause avulsions to both the anterior and posterior glenoid labrums of the right shoulder."

Based on the expert opinions of D.C. Young and Dr. Davenport, res ipsa loquitur is not applicable in this case because Roberts' right shoulder injury could have occurred in the normal course without negligence or because there are at least two equally plausible inferences that can be drawn as to whether Roberts' injury was caused by negligence—that is it was caused by the shoulder manipulation on August 19, 2010—or by long term "wear and tear." *See Winfrey*, 130 Hawai'i at 272-73, 308 P.3d at 901-02 (citing *Carlos*, 77 Hawai'i at 278, 883 P.2d at 700). Roberts neither addresses nor contests the opinions of D.C. Young or Dr. Davenport. Nor does she explain why res ipsa loquitur applies in light of that testimony. Therefore, because the doctrine of res ipsa loquitur does not apply to this case, medical expert testimony was required for Roberts' medical negligence claim and the Circuit Court did not err in granting summary judgment on that claim.

(2) When the non-moving party bears the burden of proof at trial in negligent failure to obtain informed consent claims, the following burden shifting paradigm applies:

> For a defendant physician to prevail on a motion for summary judgment upon a claim of negligent failure to obtain informed consent, "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [*Thomas v. Kidani*, 126 Hawai'i 125,] 128, 267 P.3d [1230,] 1233 [(2011)] (quoting *Fujimoto v. Au*, 95 Hawai'i 116, 136, 19 P.3d 699, 719 (2001)). The defendant physician bears the burden of demonstrating there is no genuine issue as to any material fact with respect to the essential elements of the lack of informed consent claim. *French v. Haw. Pizza Hut, Inc.*, 105 Hawai'i 462, 470, 99 P.3d 1046, 1054 (2004). When the defendant physician satisfies this initial burden, then the burden shifts to the plaintiff to demonstrate "specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." *See id.* (emphasis omitted) (quoting *GECC Fin. Corp. v. Jaffarian*, 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App. 1995)).

*Garcia v. Robinson*, 137 Hawaiʻi 388, 397, 375 P.3d 167, 176 (2016). Under this paradigm, Jayswal, as the movant, had the burden on summary judgment to demonstrate that there was no genuine issue of material fact by either: "(1) presenting evidence negating an element of the non-movant's claim, or (2) demonstrating that the non-movant will be unable to carry his or her burden of proof at trial." *Ralston v. Yim*, 129 Hawaiʻi 46, 57, 60, 292 P.3d 1276, 1287, 1290 (2013) (citing *French*, 105 Hawaiʻi at 472, 99 P.3d at 1056).

In negligent failure to obtain informed consent claims, the plaintiff-patient must, through expert testimony, "establish the nature of risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, and the nature of available alternatives to treatment." *Bernard v. Char*, 79 Hawaiʻi 371, 383, 903 P.2d 676, 688 (App. 1995) (brackets omitted) (quoting *Sard v. Hardy*, 379 A.2d 1014, 1024 (Md. 1977), *aff'd*, 79 Hawaiʻi 362, 903 P.2d 667 (1995).[4/] Under this inquiry, "the jury must determine that the risk of harm posed by a procedure was *material enough* that the doctor disclose the risk to a patient and that harm eventually occurs." *McElvaney*, 2010 WL 665422, at *2 (emphasis added) (citing *Carr v. Strode*, 79 Hawaiʻi 475, 486, 492, 904 P.2d 489, 500, 506 (1995)).

Roberts argues that under the patient-oriented approach to lack of informed consent claims, her claim did not rise and fall on the absence of expert testimony; that the Terms of Acceptance form does nothing more than provide generalized information related to chiropractic care and provides no informed consent for any specific treatment; and that even if expert testimony was required, sufficient evidence was presented to withstand summary judgment given Jayswal's "admissions" through

---

[4/]    Although Roberts references Hawaii Revised Statutes ("HRS") section 671-3(b), which governs negligent failure to obtain informed consent claims for "health care providers," as defined under HRS section 671-1, Hawaiʻi appellate courts have applied common law principles to negligent failure to obtain informed consent claims involving non-physicians, such as dentists and chiropractors. *See, e.g.*, *Bernard* (applying common law principles in dental malpractice action); *McElvaney v. Yo*, No. 28206, 2010 WL 665422 (Haw. Ct. App. Feb. 25, 2010) (applying common law principles in chiropractic malpractice action).

Answer to Interrogatory No. 3.

In her Opposition to MSJ, Roberts argued that expert testimony was not necessary because "[a] review of [the Terms of Acceptance] does not disclose any language whatsoever that could be argued to provide any informed consent. An expert is not needed to interpret the plain meaning or lack of meaning of these ordinary English words and phrases." On appeal, Roberts makes the same argument, and quoting *Carr*, 79 Hawai'i at 486, 904 P.2d at 500, adds that "[u]nder the patient-oriented standard, and keeping in mind that the Hawaii Supreme Court has stated that 'a plaintiff's case will not fail for lack of expert medical testimony regarding the prevailing standard of disclosure in the medical community for a particular medical procedure or treatment,'this evidence was sufficient to withstand summary judgment." The Terms of Acceptance provide:

> When a patient seeks chiropractic health care and we accept a patient for such care, it is essential for both to be working towards the same objective.
>
> Chiropractic has only one goal. It is important that each patient understand both the objective and the method that will be used to attain it. This will prevent any confusion or disappointment.
>
> Nervous System: The master control center of the body. It is composed of nerves, which supply life-giving energy to the entire body via nerve impulses. Innate intelligence directs the nervous system to be a self-healing mechanism.
>
> Adjustment: An adjustment is the specific application of forces to facilitate the body's correction of vertebral subluxation. Our chiropractic method of correction is by specific adjustments of the spine.
>
> Health: A state of optimal physical, mental and social well-being, not merely the absence of disease and infirmity.
>
> Vertebral Subluxation: A misalignment of one or more of the 24 vertebrae in the spinal column which causes alteration of nerve function and interference to the transmission of mental impulses, resulting in a lessening of the body's innate ability to express its maximum health potential.
>
> We do not offer to diagnose or treat any disease or condition other than vertebral subluxation. However, if during the course of chiropractic spinal examination, we encounter non-chiropractic or unusual findings, we will recommend that you seek the services of a health care provider who specializes in that area.
>
> Regardless of what the disease is called, we do not offer to treat it. Nor do we offer advice regarding treatment prescribed by others. OUR ONLY PRACTICE OBJECTIVE is to eliminate a major interference to the expression of the body's innate wisdom. Our only method is specific adjusting

to correct vertebral subluxations.

Although Roberts correctly states that under the patient-oriented standard, she could, without expert testimony, establish the *standard for disclosure, see Carr*, 79 Hawai'i at 486, 904 P.2d at 500; and although Roberts is correct that the Terms of Acceptance provide no information regarding the specific procedure involved in the August 19, 2010 Injury; Roberts was still required to provide expert testimony as to the *"materiality" of the risk of treatment*. *See id.* at 486, 904 P.2d at 500 (cautioning that the "patient-oriented standard does not relieve plaintiffs of their burden to provide expert medical testimony as to the 'materiality' of the risk," and establishing that "to the contrary, a plaintiff maintains the burden of adducing expert medical testimony to establish "the nature of risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, and the nature of available alternatives to treatment" (citing and quoting *Bernard*, 79 Hawai'i at 383, 903 P.2d at 688)).

In Roberts' Opposition to MSJ, the only expert testimony proffered was Jayswal's Answer to Interrogatory No. 3, which Roberts asserts is an admission as to a lack of informed consent. This argument misses the point as it fails to address the "materiality" of the risk of treatment. Moreover, there is no discussion of the "materiality" of the risk of treatment in Answer to Interrogatory No. 3.

In contrast, Jayswal provided the expert opinion of D.C. Young as to the materiality of risk associated with the right shoulder manipulation involved in the August 19, 2010 Injury.[5] Based on D.C. Young's conclusion, informed consent was

---

[5]    The report provides, in relevant part:

2.    Application of a standing shoulder mobilization technique on 8-19-2010 was reasonable. *By that date, that shoulder treatment had been applied 3-4 times according to Ms. Roberts and nine times by Dr. Jayswal's charting; all previous were without incident.*

3.    Manual mobilization of extremity joints by chiropractors is safe. The maneuvers are performed on

(continued...)

9

not necessary because the risk of injury from the shoulder manipulation was "exceedingly small."

In opposing Jayswal's MSJ, Roberts did not address whether the risk associated with the right shoulder manipulation was "material" or not. Rather, Roberts argued that she could rely on the doctrine of res ipsa loquitur to negate the need for expert testimony and/or that she could show a lack of informed consent based on Jayswal's Answer to Interrogatory No. 3 and his medical chart. As previously explained, res ipsa loquitur is not applicable to this case and Jayswal's Answer to Interrogatory No. 3 and the Terms of Acceptance do not relieve Roberts of her burden to produce expert testimony.

Accordingly, because Jayswal was able to refute the essential element of the materiality of risk associated with the procedure on August 19, 2010, he satisfied his initial burden on summary judgment, and because Roberts did not offer expert testimony in rebuttal, she failed to sustain her burden to withstand summary judgment. *See Bernard*, 79 Hawaiʻi at 383, 903 P.2d at 688; *Carr*, 79 Hawaiʻi at 486, 904 P.2d at 500; *see also Eddins v. Morrison*, 105 Hawaiʻi 376, 377-78, 98 P.3d 247, 248-49 (App. 2004) (affirming summary judgment in favor of defendant-physician because defendant produced expert opinions to satisfy his initial burden and because plaintiff failed to present any

_____

[5]/(...continued)
"unloaded" joints in anatomically neutral positions and the area is typically stabilized to ensure that only the joint of interest is moved. In the case of the shoulder mobilization, Ms. Roberts' arm position ensured an "unpacked" or "unlocked" joint and the area was stabilized by Dr. Jayswal's indifferent hand. As demonstrated on the video and by virtue of her hand on her right hip, her arm/shoulder was abducted about 30° with internal rotation plus a small amount of forward flexion; all well within the normal range of motions. The mobilization is a grade IV with a quick, low amplitude or "shallow thrust that does not exceed the normal motion of the joint.

4. Informed consent for the shoulder mobilization was not necessary on 8-19-2010 because by that date Ms. Roberts had received that treatment between 3 and 9 times without incident and did not decline the shoulder treatment on 8-19-2010 or previously. *Informed consent for the procedure on the date of initial treatment was not required because the risk of injury from shoulder mobilizations is exceedingly small based on #3 above.*

(Emphasis added.)

admissible expert opinion to rebut defendant's evidence, thereby establishing prima facie that defendant was entitled to judgment as a matter of law).  Viewing the evidence and inferences in the light most favorable to Roberts, Jayswal established prima facie that there remained no genuine issue of material fact, and the Circuit Court did not err in concluding that Jayswal was entitled to judgment as a matter of law as to Roberts' informed consent claim.

Therefore, the October 19, 2015 Order Granting Defendant Anthony Jayswal, D.C. dba Healing Hands Chiropractic of Maui's Motion for Summary Judgment Filed on August 4, 2015 and the November 18, 2015 Final Judgment entered by the Circuit Court of the Second Circuit are affirmed.

DATED:  Honolulu, Hawaiʻi, June 7, 2019.


On the briefs:

Rebecca A. Copeland
(Law Office of Rebecca A.
Copeland, LLC)
for Plaintiff-Appellant.

Wesley H.H. Ching and
Gurudev D. Allin
(Fukunaga Matayoshi Ching &
Kon-Herrera)
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge